J-S16001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: D.W.C., A MINOR | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA<br>:<br>:<br>: |
| APPEAL OF: W.C., FATHER | :<br>:<br>:<br>:<br>:<br>:<br>: No. 1578 WDA 2025 |

Appeal from the Decree Entered November 10, 2025
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
2025-A0088

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: S.M.C., A MINOR | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA<br>:<br>:<br>: |
| APPEAL OF: W.C., FATHER | :<br>:<br>:<br>:<br>:<br>:<br>: No. 1579 WDA 2025 |

Appeal from the Decree Entered November 10, 2025
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
2025-A0089

BEFORE: LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.:        **FILED: May 27, 2026**

W.C. (Father) appeals from the decrees, entered in the Court of Common Pleas of Erie County, involuntarily terminating his parental rights to his minor children, D.W.C. (born 9/13) and S.M.C. (born 7/19) (collectively, Children). After careful review, we affirm.

The Erie County Office of Children and Youth (OCY/the Agency) first became involved with Father and Children after Pennsylvania State Police

Officers found then-eleven-year-old D.W.C. one mile from his home at 11:30 p.m. on February 15, 2025.[1] When the officers took D.W.C. home, they found then-five-year-old S.M.C. awake and Father passed out in his bed, appearing to be under the influence of alcohol and drugs. *See* N.T. Termination Hearing, 11/6/25, at 75 (Father testifying he had four rum and cokes and was using medical marijuana evening of February 15, 2025). OCY obtained an emergency protective order for Children. Father was arrested and charged with two counts of endangering the welfare of a child.[2]

At a February 19, 2025 shelter care hearing, OCY testified that Father has a history of substance abuse and domestic abuse, and he had a lengthy criminal record. *Id.* at 14. The Agency also alleged that the family had a history with OCY dating back to 2021 for the following concerns: inadequate basic hygiene; home conditions; inadequate health care for Children; untreated mental health issues; and domestic violence.[3] Father was given the following permanency plan goals: submit to paternity testing; engage in mental health assessment and follow any psychiatric/therapeutic recommendations; obtain and maintain stable and safe housing; refrain from

___

[1] An OCY caseworker testified D.W.C. was trying to go to the school to get help when he was found. *See* N.T. Termination Hearing, 11/6/25, at 13.

[2] Father pled guilty to one count of EWOC in June 2025 and was sentenced to 13 to 36 months of imprisonment.

[3] Children's Mother's parental rights were also involuntarily terminated. She is not a party to this appeal.

domestic violence; participate in OCY-approved anger management program; participate in Children's medical appointments and educational meetings; maintain gainful employment; participate in parenting education program; refrain from using drugs and/or alcohol; submit to random urinalysis testing; and sign any releases for information requested by the Agency. *See* Order, 3/5/25; *see also* N.T. Termination Hearing, 11/6/25, at 16.

Children were adjudicated dependent on February 27, 2025. D.W.C. was placed with his paternal aunt and uncle in kinship foster care. S.M.C., who has special needs, was placed in a foster home. Children's foster/kinship homes, with whom they continue to reside, are permanent resources. Reunification was established as the permanency goal. On May 13, 2025, an OCY caseworker met with Father to discuss his treatment plan and whether he wanted to participate in services. The caseworker testified that Father "was not interested in services and he was more focused on the [criminal] charges and trying to say that [OCY was] lying and that the police were lying[.]" N.T. Termination Hearing, 11/6/25, at 32.

The court held two permanency review hearings on May 7, 2025, and August 11, 2025. Although Father was incarcerated at the time of both hearings, he attended the hearings in person and with counsel. The court determined that Father was not compliant with his plan goals and had made no progress in alleviating the conditions necessitating Children's removal. *Id.* at 31. Following the first hearing, the court added a concurrent goal of adoption to the permanency plan. Following the second hearing, the court

changed the goal from reunification to adoption and found that OCY was no longer required to make reasonable efforts to provide services to Father. *Id.*

On August 15, 2025, OCY filed petitions to involuntarily terminate Father's parental rights to Children. On November 6, 2025, the trial court held a termination hearing at which Father, OCY Caseworker Christina Cimentada, and paternal uncle/kinship provider Robert Brown testified.[4] Following the hearing, the court entered decrees terminating Father's parental rights to Children pursuant to subsections 2511(a)(1), (2), (5), and (b) of the Adoption Act.[5] Father filed a timely notices of appeal and contemporaneous Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal.[6] *See*

---

[4] Deanna Heasley, Esquire, served as Children's legal counsel and guardian *ad litem* (GAL) at the termination hearing. *See* 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings); *In re K.R.*, 200 A.3d 969 (Pa. Super. 2018) (en banc), *but see In Re: T.S., E.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."). We note that the trial court agreed with Attorney Heasley's position that the Children's legal interests and best interests merged and that there was no conflict in her serving as Children's legal counsel. *See* N.T. Termination Hearing, 11/6/25, at 8-10. Attorney Heasley also believed that OCY carried its burden and that it was in Children's best interest that Father's parental rights be terminated. *Id.* at 97-98.

[5] 23 Pa.C.S.A. §§ 2101-2938.

[6] On March 17, 2026, our Court *sua sponte* consolidated these appeals at 1578 EDA 2025 and 1579 WDA 2025, as they involved related parties and issues. *See* Pa.R.A.P. 513.

Pa.R.A.P. 1925(a)(2)(i). Father presents the following issues for our consideration:

(1) Did the [t]rial [c]ourt abuse its discretion in terminating [Father's] parental rights when the record is comprised of insufficient competent evidence to establish grounds for termination, and when [Father] had complied with [c]ourt[-]ordered services to the best of his ability under the circumstances?

(2) [D]id the [t]rial [c]ourt abuse its discretion by finding that severance of [Father's] parental rights would serve the child[ren]'s best interest?

Appellant's Brief, at 4.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well[-]established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence[,] in light of the totality of the circumstances[,] clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In the Int. of K.T.*, 296 A.3d 1085 (Pa. 2023) (section 2511 requires bifurcated analysis where party seeking termination of parental rights first bears burden of proving, by clear and convincing evidence, at least one of eleven grounds for termination under subsection 2511(a) exist before moving on to determine whether termination meets needs and welfare of child under subsection 2511(b)).

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Father first argues that the OCY did not prove, by clear and convincing evidence, that termination of his parental rights was proper under subsection 2511(a)(2)[7] where he "has been incarcerated since the beginning of the underlying [d]ependency case [and] was willing to participate in services[,] but that between his periods of incarceration[], there had been no programming offered to him." *Id.* at 12. Thus, because he "reached out to providers in an effort to engage in mental health treatment, substance abuse treatment, and family engagement services," and they failed to provide him services, Father claims that the trial court erred in concluding "that is was unlikely that [he] would remedy the conditions that led to . . . his incapacity/refusal[.]" *Id.* at 13.

A court may terminate parental rights under subsection 2511(a)(2) where the

> repeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for his physical or mental

---

[7] Father generally argues that OCY did not prove termination under any subsection of 2511(a). However, because we can affirm the trial court's decision regarding the termination of parental rights with regard to any single subsection under 23 Pa.C.S.A. § 2511(a), *see In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc), we dispose of this issue on the grounds of subsection 2511(a)(2).

well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). Moreover, while "incarceration neither compels nor precludes termination," *In re Z.P.*, 994 A.2d 1108, 1120 (Pa. Super. 2010), our Supreme Court has emphasized that an incarcerated parent has "a duty to utilize available resources to continue a relationship with his or her child." *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012). In fact, an incarcerated parent's parental rights may be terminated "if the [] parent fails to utilize given resources *and* to take affirmative steps to support a parent-child relationship." *In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super.2008) (citation omitted) (emphasis in original). *See In re V.E.*, 611 A.2d 1267, 1271-72 (Pa. Super. 1992) (citation omitted) ("[A] parent is expected to utilize whatever resources are available to him while in prison in order to foster a continuing close relationship with his children. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited.").

Father continues to fail to accept responsibility for Children being removed from his care and placed into foster care. Even though he pled guilty to EWOC—the cause of Children's placement and dependency—he still refuses to take accountability for his actions. Save for sending a few letters to Children, Father has done nothing to perform his parental duties while in prison. However, even those letters were deemed inappropriate for Children to read, where Father accused D.W.C. of lying about Father hitting him,

questioned S.M.C.'s paternity, and continued to deny that he ever used drugs. ***See*** N.T. Termination Hearing, 11/6/25, at 83-86.

Additionally, while Father claims that he reached out to providers in order to receive treatment and engage in family services when he was incarcerated, testimony from OCY caseworker Cimentada paints a very different picture of Father's efforts to fulfill his permanency plan goals. Caseworker Cimentada testified Father was combative, repeatedly refused to acknowledge that he was responsible for Children's placement, expressed no remorse for his actions leading to Children's placement, and consistently denied that he had any substance abuse problems. ***See*** N.T. Termination Hearing, 11/6/25, at 22-25, 33. Cimentada testified that, while there were services available to Father in prison, he refused her offer to obtain access to those services, specifically declining drug/alcohol and mental health services because he did not want to "mess up" his criminal case. ***Id.*** at 22-24, 32. ***See S.P.***, ***supra*** (courts not willing to completely toll parent's responsibilities during incarceration; court must inquire whether parent has utilized resources at his command while in prison to continue close relationship with child).

Father's continued excuses and refusal to accept Agency services while incarcerated demonstrate that Father will not remedy the conditions and causes of Children's lack of parental care, control, or subsistence necessary for their physical and mental well-being. Accordingly, we conclude that the trial court did not abuse its discretion when it terminated Father's parental rights under subsection 2511(a)(2).

Father next contends that the trial court improperly concluded that termination was proper under subsection 2511(b) where the court never addressed any bond between him and Children, failed to consider the effect that termination would have on any bond, and where "OCY established only through implication that Children would be more stable and, presumably, better off in their placements at the time of the [involuntary termination of parental rights] hearing." Appellant's Brief, at 17.

This Court has held that the trial court is not required by statute or precedent to order that a formal bonding evaluation be performed by an expert. *See In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008). Additionally, our Court has found that there are some instances where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child. *See In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008) (citation omitted). In fact, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *Id.* at 763. "The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *Id.*

Instantly, Father has been incarcerated since Children were removed from his care. At the time of the termination hearing, Father remained incarcerated at SCI Camp Hill. Caseworker Cimentada testified that D.W.C. "felt safe and stable" where he was living and wanted to remain with his kinship family. N.T. Termination Hearing, 11/6/25, at 51. Similarly,

caseworker Cimentada testified S.M.C. had finally found stability with her foster family and did not ask about Father. *Id.* at 41.[8]

> In addition to a bond examination, a court can equally emphasize the safety needs of the child under subsection 2511(b), particularly in cases involving physical or sexual abuse,[9] severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent-child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*K.Z.S.*, 946 A.3d at 763.

Here, Children's needs are being met by their kinship and foster families, both of whom are adoptive resources. *See* N.T. Termination Hearing, 11/6/25, at 43, 51. Caseworker Cimentada testified that Children would not

---

[8] The notes of testimony from Father's sentencing hearing for his EWOC conviction are attached to a pre-dispositional summary that is included in the certified record on appeal. At Father's sentencing hearing, D.W.C's victim impact statement was read by his guardian, paternal uncle. In the statement, D.W.C. expressed that he had a level of fear of being reunified with Father, that he doesn't want to live with Father anymore, and that he feared Father because Father had threatened to kill him. *See* Pre-Dispositional Summary, 9/3/25, at 10-14. Similarly, the assistant district attorney in Father's criminal matter stated that she had spoken to S.M.C.'s guardian, who indicated that S.M.C. feels "mad and scared about what happened" with Father, that she would like Father to be sent to jail, and that she is "often very afraid of seeing [Father] out in public and what could happen if she sees him or is reunited with him." *Id.* at 14.

[9] Caseworker Cimentada also testified that D.W.C. disclosed Father had punched him in the stomach and pushed him, causing him to hit his head on a cabinet door. *See* N.T. Termination Hearing, 11/6/25, at 21-22. The allegation led to an investigation and resulted in Father being indicated as a perpetrator of abuse. *See* 23 Pa.C.S.A. § 6303.

suffer any detriment effects if Father's parental rights were terminated. *Id.* at 42, 46-47. Here, the court properly prioritized Children's safety needs, as well as their developmental, physical, and emotional welfare, over maintaining an unhealthy and relatively non-existent relationship with Father, who has been incarcerated for the duration of Children's placement. *See also In the Int. of K.T.*, *supra* at 1107 (under subsection 2511(b), courts must consider whether trauma of breaking any existing parent-child bond is outweighed by benefit of moving child toward permanent home); *In re T.S.M.*, 71 A.3d 251 (Pa. 2013) (existence of unhealthy and pathological parent-child bond severed in order to permit children be placed in healthy, permanent foster homes).

Based upon the record, it is clear that Children deserve permanency and stability that Father cannot provide. *See* N.T. Termination Hearing, 11/6/25, at 101 (trial judge telling Father, "these children . . . are not required to put their lives on hold in the hopes that when you are released from jail . . . you'll address your sobriety, acknowledge what you've done to put their lives in this turmoil, uproot their lives, come to terms with that and alleviate it or essentially make the appropriate changes"). Accordingly, we conclude that OCY proved, by clear and convincing evidence, that termination under subsection 2511(b) would best serve Children's needs and welfare.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

5/27/2026